UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────

DAPHNE VAN EVER-FORD,

        Plaintiff,

   v.                                      13-CV-412
                                              DECISION & ORDER

STATE OF NEW YORK, OFFICE OF
MENTAL HEALTH (BUFFALO
PSYCHIATRIC CENTER), and Dr. ANN
MARIE T. SULLIVAN, COMMISSIONER
OF THE OFFICE OF MENTAL HEALTH,
in her official capacity,

        Defendants.

───────────────────────────────────

On April 25, 2013, the plaintiff, Daphne Van Ever-Ford, commenced this action against the State of New York for discrimination on the basis of her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. Docket Item 1. The case originally was assigned to United States District Judge Richard J. Arcara, who referred the matter to United States Magistrate Judge Jeremiah J. McCarthy for all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 14. The case was reassigned from Judge Arcara to this Court on March 8, 2016. Docket Item 51.

On March 18, 2016, this Court scheduled trial to begin on August 24, 2016. Docket Item 53. In her trial brief submitted on July 19, 2016, Van Ever-Ford explained in a footnote that her counsel had learned that because of sovereign immunity and the Eleventh Amendment, the State of New York is immune from suit under the ADA.

Docket Item 59 at 4 n.1.  The scheduled trial therefore was adjourned so that Van Ever-Ford could reassess her strategy.

On August 18, 2016, Van Ever-Ford filed an amended complaint naming the State of New York Office of Mental Health ("Office of Mental Health") as the sole defendant and raising a claim only under the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").[1]  Docket Item 64.  The Office of Mental Health moved for summary judgment, Docket Item 65, and on October 17, 2016, Judge McCarthy issued a report and recommendation ("R&R"), recommending that the motion be denied, Docket Item 72.

On June 8, 2017—before this Court had decided whether to adopt the October 2016 R&R—Van Ever-Ford moved to amend her complaint again.  Docket Item 82.  This time, she sought to add an ADA claim against the Office of Mental Health and its Commissioner, Ann Marie T. Sullivan ("the Commissioner"), in her official capacity.  *Id.*  On September 12, 2017, Judge McCarthy issued another R&R, recommending that Van Ever-Ford be denied leave to amend her complaint.  Docket Item 94.

Van Ever-Ford objected to the September 2017 R&R.  Docket Item 95.  After hearing oral argument, this Court granted her leave to amend her complaint.  Docket Items 100 and 101.  On December 22, 2017, Van Ever-Ford amended her complaint to add an ADA claim against the Commissioner.  Docket Item 102.

---

[1]  In response to the Supreme Court's decision in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), Congress enacted § 1003 of the Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, 100 Stat. 1845 (1986), unequivocally expressing its intent to abrogate the states' Eleventh Amendment sovereign immunity for claims under the Rehabilitation Act.  *See Lane v. Pena*, 518 U.S. 187, 198 (1996).

On August 16, 2018, the defendants again moved for summary judgment. Docket Item 111.  On April 30, 2019, this Court granted the defendants' motion in part and denied it in part.  Docket Item 120.  More specifically, the Court dismissed Van Ever-Ford's claims under the Rehabilitation Act but allowed her claim for injunctive relief under the ADA to proceed.  *Id.* at 30.

This Court held a bench trial on December 16 and 17, 2019.  Docket Items 145 and 146.  On February 7, 2020, the parties submitted post-trial briefs.  Docket Items 150 and 151.  The Court ordered supplemental briefing, Docket Item 161, which the parties provided on May 6, 2020, Docket Items 162 and 163.  The Court held oral argument on May 15, 2020, and took the matter under advisement.  Docket Item 165.

After carefully considering all the evidence, the Court finds that Van Ever-Ford has not carried her burden to establish, by a preponderance of the evidence, that the defendants violated the ADA.  This decision and order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

The Court has made its findings of fact based on all the testimony and exhibits presented at trial but explicitly addresses only those facts that are relevant to issues considered "material to the resolution of the parties' claims."  *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citations omitted).  Moreover, "[t]he distinction between law and fact is anything but clear-cut," and therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling.  *Id.* (citations and internal quotation marks omitted).

I.      **VAN EVER-FORD'S HIRING**

On December 22, 2009, the Office of Mental Health hired Van Ever-Ford as a

Mental Health Therapy Aide ("MHTA") Trainee at the Buffalo Psychiatric Center

("BPC"), effective January 14, 2010.  Joint Exhibit 1.  Van Ever-Ford's position

"require[d] a one-year probationary period."  *Id.*

During the probationary period, a BPC employee has "not officially been selected

for the position."  Docket Item 149 at 255.  Instead, "[t]he probationary period is

considered to be part of the selection process," and "[a]n employee has to successfully

complete probation in order to be considered as officially selected for the position."  *Id.*

While an employee is on probation, the BPC "can choose to terminate [her] without

having to follow the disciplinary process [that is] laid out in the collective bargaining

agreements."  *Id.*

Before beginning her employment, Van Ever-Ford was required to undergo a

physical examination.  Joint Exhibit 1.  As part of that examination, she provided a

medical history that identified the following conditions: "[m]igraine [h]eadaches—most

recent 5/2009"; "[s]inusitis—12/2009 occasional sinus pressure when weather

changes"; "[i]nfluenza—10/2009"; and "[h]ernia—umbilical hernia operation during

childhood (around 4 yrs old)."  Joint Exhibit 4.  She did not claim to have a disability.

*See id.*

The BPC is a 24/7 inpatient psychiatric hospital.  Docket Item 149 at 256.  It has

a written time-and-attendance policy addressing unscheduled absences, entitled the

Unscheduled Absenteeism Control Program.  Joint Exhibit 2.  The purpose of this policy

is "to reduce absenteeism to its lowest possible level in order to maximize the delivery

of services provided to mentally ill patients who have entrusted their care and treatment to this facility." *Id.* at 1.

The policy defines an unscheduled absence "as any absence that has not been requested and approved in advance." *Id.* at 2. For example, the policy explains, if an employee calls in on a Monday and "indicates that s/he will be off-duty until Thursday, only the first day of absence will be considered unscheduled." *Id.*

The BPC's time-and-attendance policy also addresses "[u]nauthorized [a]bsence[s]." *Id.* at 2-3. Unauthorized absences are those "which are neither approved nor subsequently authorized. This would include what is referred to as 'no-call/no-show', where an employee does not notify (or notify in a timely fashion) the supervisor that s/he will be absent." *Id.* "Employees who provide direct patient care services, such as . . . MHTA[s], must provide notification to the supervisor one hour prior to the start of the shift" to avoid an unauthorized absence. *Id.* at 3.

Because the BPC provides direct patient care, it is required to maintain minimum staffing levels. Docket Item 149 at 256, 261-62. Thus, when an MHTA has an unscheduled or unauthorized absence, the facility has to find another employee to work overtime to cover that shift. *Id.* And if the facility cannot find someone to voluntarily cover the shift on short notice, it must require someone on the previous shift to stay and work consecutive shifts. *Id.* Such mandatory overtime takes a significant "toll on employee morale, and also can have an impact on patient care." *Id.* at 262. Moreover, additional absences following an unscheduled absence can also be disruptive—even though they are not formally considered unscheduled absences—because they can result in overtime for other employees. *Id.* at 45.

"[T]ime and attendance is . . . a critical factor in assessing a probationary employee's performance and whether or not they should complete probation . . . ." Docket Item 149 at 282-83; *see also id.* at 256.  Accordingly, the BPC's time-and-attendance policy has a specific provision that applies to probationary employees.  Joint Exhibit 2 at 4.  That provision states that "[a]n employee's attendance should be an important factor in every probationary report and performance evaluation" and that "[e]mployees should be terminated from probation if their attendance record is unsatisfactory."  *Id.*

## II.    VAN EVER-FORD'S ATTENDANCE RECORD

Because Van Ever-Ford worked the night shift, her shifts began at 11:40 p.m. the night before the scheduled date.  Docket Item 147 at 12.  So, for example, the January 2 shift would begin at 11:40 p.m. on January 1.

Van Ever-Ford's Leave Usage Report documents the following absences:

• March 19, 2010—unscheduled sick leave;

• May 11, 2010—unscheduled sick leave;

• June 22, 2010—personal leave;

• July 2, 2010—unscheduled sick leave;

• July 3, 2010—scheduled sick leave;

• July 4, 2010—scheduled sick leave;

• July 6, 2010—scheduled sick leave;

• July 24, 2010—emergency personal leave;

• August 6, 2010—unscheduled sick leave;

• August 7, 2010—scheduled personal leave;

6

• August 8, 2010—scheduled sick/personal leave;

• August 24, 2010—scheduled personal leave;

• August 31, 2010—scheduled vacation/personal leave;

• September 17, 2010—unscheduled sick leave for family member;

• September 26, 2010—left early; sick/vacation leave;

• September 27, 2010—unscheduled vacation leave;

• September 28, 2010—leave without pay;

• October 1, 2010—scheduled sick leave/vacation leave.

Joint Exhibit 7.

## A.    First Probationary Reporting Period

During Van Ever-Ford's first probationary reporting period, which ended on March 11, 2010, she had no absences but was late once.  Joint Exhibit 5 at 1; Joint Exhibit 7 at 1.  Her probationary report for that period rated her time and attendance as "satisfactory."  Joint Exhibit 5 at 2.

## B.    Second Probationary Reporting Period

During Van Ever-Ford's second probationary reporting period, ending on June 17, 2010, she had two sick-leave absences.  Joint Exhibit 6 at 1; Joint Exhibit 7 at 1-2. The first was due to a spider bite and the second was due to a sinus issue.  Docket Item 147 at 73, 75.  Both were unscheduled absences that were adjacent to her "pass days"—that is, regularly scheduled days off.  *Id.*; Docket Item 147 at 34.[2]  Van Ever-

---

[2]  MHTAs get two consecutive pass days for every forty hours that they work. Docket Item 149 at 50-51.

Ford's time and attendance for the second reporting period again was rated "satisfactory."  Joint Exhibit 6 at 2.

### C.   Third Reporting Period

Van Ever-Ford was absent on June 22, 2010, and used personal leave.  Joint Exhibit 7 at 2.  This absence was immediately before two pass days.  *Id.*  Van Ever-Ford could not recall the reason for her June 22 absence.  Docket Item 147 at 75.

Van Ever-Ford saw her primary care physician, Tarik Elibol, M.D., on June 30, 2010.  Defendants' Exhibit 7 at 100; Docket Item 147 at 77.  She reported having left flank pain for the past two days.  Defendants' Exhibit 7 at 100; Docket Item 147 at 77.  Dr. Elibol noted that the pain might be due to kidney stones and referred her to a urologist.  Defendants' Exhibit 7 at 100; Docket Item 147 at 77.  He told her that she should "stay off work."  Defendants' Exhibit 7 at 100.

On July 2, 2010, Van Ever-Ford had an unscheduled sick absence following two pass days.  Joint Exhibit 7 at 2; Docket Item 149 at 29.  She then had two scheduled sick absences on July 3 and 4.  Joint Exhibit 7 at 2; Docket Item 149 at 29-30.  July 5 was the day that the Independence Day holiday was observed.  Joint Exhibit 7 at 2.  She had another scheduled sick absence on July 6.  Joint Exhibit 7 at 2; Docket Item 149 at 30.  She saw Dr. Elibol that day, and he wrote that she could go "[b]ack to work."  Defendants' Exhibit 7 at 99.  She had two pass days on July 7 and 8 and returned to work on July 9.  Joint Exhibit 7 at 2.

On July 24, 2010, Van Ever-Ford had an unscheduled absence immediately after two pass days.  Joint Exhibit 7 at 3.  She used emergency personal leave.  *Id.*  There is

no evidence in the record about the underlying reason for her July 24 absence. *See* Docket Item 147 at 82-83; Docket Item 149 at 30.

Van Ever-Ford again saw Dr. Elibol on August 3, 2010. Defendants' Exhibit 7 at 98; Docket Item 147 at 83. She complained of right ear pain and a dry cough. Defendants' Exhibit 7 at 98; Docket Item 147 at 83. Dr. Elibol diagnosed her with sinusitis (sinus infection). Defendants' Exhibit 7 at 98; Docket Item 147 at 84.

On August 6, 2010, Van Ever-Ford had an unscheduled sick absence immediately after two pass days. Joint Exhibit 7 at 3. That same day, Paul Shea, the BPC Assistant Director of Nursing, sent an e-mail to Van Ever-Ford's supervisor, John Wrobel, stating that Shea had been "reviewing probationary employees" and noticed that Van Ever-Ford "started in Jan and has 10 call ins all with pass days."[3] Defendants' Exhibit 2 at 4; Docket Item 149 at 4. Shea asked Wrobel, "are all these reflected on her evals and have we done anything corrective?" Defendants' Exhibit 2 at 4.

Van Ever-Ford again was absent on August 7, using personal leave, and on August 8, using a combination of personal and sick leave. Joint Exhibit 7 at 3.

On August 18, 2010, Wrobel responded to Shea's August 6 email. Defendants' Exhibit 2 at 3. He stated that Van Ever-Ford's "first quarterly evaluation ended 3/11/10"; by then "she only had one unscheduled" absence. *Id.* Likewise, he said, "[h]er second quarterly ended on 6/17/10" and "there was only one unscheduled [absence] in that quarter." *Id.* Therefore, "[n]either the first or the second evaluation mentioned violations of policy 798." *Id.*

---

[3] When an employee frequently uses sick leave adjacent to pass days, that "raise[s] questions" about whether the employee is making "appropriate use of sick leave." Joint Exhibit 2 at 4.

"In July," Wrobel continued, "she called-in [sic] five days S/A [sick absence] and in August three days.  She definitely will be counseled on the next quarterly evaluation." *Id.*  Shea responded to Wrobel, "[p]lease give her written counseling now[;] she is over half of her probationary period [and] there is no sense waiting for her next eval to address this issue."  *Id.*  Shea added, "please point out [that] any further SA will result in recommending termination.  We need to get her attention—thanks."  *Id.*

Wrobel then informally "coach[ed]" Van Ever-Ford to inform her that she was approaching a violation of the time-and-attendance policy and that her employment might be in jeopardy.  Joint Exhibit 21 at 255, 263; *see also* Joint Exhibit 12.  During this discussion, Wrobel reminded Van Ever-Ford about the BPC's employee assistance program ("EAP") and how she could avail herself of that resource if she needed it.  Joint Exhibit 21 at 255, 258-59, 263.  The only explanation Van Ever-Ford gave for the absences was that she had "a history of having 'stones' in her ureters causing her great pain."  Defendants' Exhibit 3 at 1.

On August 24, 2010, Van Ever-Ford again was absent from work immediately before two pass days.  Joint Exhibit 7 at 3.  She used personal leave to cover this absence and could not recall why she took the day off.  *Id.*; Docket Item 147 at 84.

On August 31, 2010, Van Ever-Ford again was absent from work the day before two pass days.  Joint Exhibit 7 at 3.  She used personal and vacation leave to cover her absence on this day.  *Id.*  There is no evidence in the record about the reason for this absence.  *See* Docket Item 147 at 84; Docket Item 149 at 31.

On September 17, 2010, Van Ever-Ford had another unscheduled absence immediately following two pass days.  Joint Exhibit 7 at 3.  She testified that the reason

10

for this absence was that her son swallowed a penny, and she took him to the emergency room.  Docket Item 147 at 86.  She and her son arrived at the emergency room at 3:00 p.m. on September 16—one of her pass days.  Joint Exhibit 11 at 1; Docket Item 147 at 86.  They were discharged at 6:00 p.m.—roughly five and a half hours before her September 17 shift at BPC was scheduled to begin—and Van Ever-Ford was advised to monitor her son.  Joint Exhibit 11 at 1; Docket Item 147 at 86-87.  So she did not report to work that evening and used family sick leave to cover this absence.  Joint Exhibit 7 at 3.

On September 20, 2010, Susan Fallis—the BPC Director of Nursing—emailed Wrobel, asking: "where is the documentation that you spoke to [Van Ever-Ford]?"  Defendants' Exhibit 2 at 3.  Fallis noted that Van Ever-Ford had "again called in on Thursday."  *Id.*  She added that "[t]his employee is a probationary employee, and [she] has called in numerous times for a variety of reasons.  Her use of sick time may indicate a use of sick time for reasons other than illness.  Her call-ins jeopardize our ability to staff the facility adequately to serve the patients."  *Id.*

On September 21, 2010, Wrobel issued Van Ever-Ford a written counseling memorandum.  Joint Exhibit 12.  The memorandum stated, among other things: "I cannot stress enough to you, the need to come to work without having any [u]nscheduled [a]bsences.  Your employment may be terminated as a result of the [u]nscheduled [a]bsences you have accrued."  *Id.*  Van Ever-Ford responded with the following comment: "As a mother I cannot promise BPC that there will not be more unschedule[d] absences because I cannot foresee the future re: emergencies with my children or myself."  *Id.*

11

At some point in or around September 2010, Nurse Administrator Yvonne Long also spoke to Van Ever-Ford informally about her absences.  Docket Item 147 at 130-33.  Long brought Van Ever-Ford into the kitchen and told her, "I've noticed [that] you [have] been calling in.  You have to stop calling in. . . . [I]f you don't stop calling in, they are going to terminate you."  *Id.* at 132.  Long also advised Van Ever-Ford that if she was a having a problem, she should "go to EAP, go to HR, or go to [her] union so that [she had] some legal ground on why [she was] calling in."  *Id.*

Van Ever-Ford reported to work at 11:40 p.m. on September 25, 2010, for her September 26 shift.  Docket Item 147 at 87.  Shortly after arriving, she told Donna Haxton—a nurse who also was working the night shift—that she had a bad headache and had not been feeling well all day.  Joint Exhibit 20 at 134-37.  Another nurse, Jenna Hanley, checked Van Ever-Ford's blood pressure, and it was high.  *Id.* at 139.  Haxton subsequently checked Van Ever-Ford's blood sugar, which also was high.  *Id.* at 143.

Haxton spoke with Long, who was the Nurse Administrator for that shift, several times about Van Ever-Ford.  *Id.* at 139-40, 142-43, 146.  Haxton also spoke to a doctor on call at the BPC and relayed Van Ever-Ford's symptoms.  *Id.* at 141-142, 144.  The doctor told Haxton that it did not seem like a hypertensive crisis and, therefore, she did not think it was necessary for her to see Van Ever-Ford.  *Id.* at 144.

Long told Haxton that if Van Ever-Ford was not feeling well, she could leave.  *Id.* at 140, 146.  Van Ever-Ford decided to do so, and her husband picked her up at 12:55 a.m.  Joint Exhibit 13 at 8.

A short time later, Van Ever-Ford went to the hospital:  She arrived at the emergency department of the Sisters of Charity Hospital at 2:12 a.m. on September 26,

2010, "with complaints of [h]eadache" and "[h]igh [b]lood [p]ressure."  Joint Exhibit 14 at

7.  She had "pain to the top of [her] head and forehead," which she "describe[d] . . . as a

pressure."  *Id.*  She reported the onset as two days prior.  *Id.*  She was "negative[ ]" for

"altered mental status, dizziness, fever, malaise, nausea, neck stiffness, [and] vision

changes."  *Id.*  Her blood pressure was 168/111.  *Id.* at 8.

At 4:17 a.m., she was given Toradol and Compazine.  *Id.*  At 5:08 a.m., she

reported that her pain was gone.  *Id.*  At 6:46 a.m., her blood pressure was down to

132/78.  *Id.*  The hospital's "Disposition Summary" states that the "[p]roblem is new" and

that the "impression" was "[a]cute headache."  *Id.*  The emergency department records

make no mention of a migraine headache.  *See id.* at 7-11; *see also* Docket Item 147 at

121 (Van Ever-Ford's confirming that the diagnosis from this visit was "[a]cute headache

as the result of the onset of high blood pressure" and she was "never diagnosed as

having a migraine headache . . .. during this incident").

At approximately 1:00 p.m. that day, Van Ever-Ford called the BPC and spoke to

William Hoak, one of the Nurse Administrators on the day shift.  Joint Exhibit 13 at 8;

Docket Item 147 at 52-53; Docket Item 149 at 83-85.  Van Ever-Ford told Hoak that she

had gone to the emergency room the night before and "that they gave [her] a doctor's

note to return to work two days after the 26th."  Docket Item 147 at 53.  Because the

night shift at the BPC begins at 11:40 p.m. on the evening prior to the day of the shift,

Hoak interpreted the note as permitting Van Ever-Ford to be off for two shifts—returning

at 11:40 p.m. on September 27 for her September 28 shift.  Joint Exhibit 13 at 8; Docket

Item 147 at 53; Docket Item 149 at 83-85.  Hoak explained to Van Ever-Ford that "if

there were two shifts authorized by the emergency department, and if the return to work

13

was listed as the 28th, that would be 11:40 p.m. on the 27th."  Docket Item 149 at 85;

*see also* Docket Item 147 at 53 (Van Ever-Ford's testifying that "Hoak said that he

expected [her] to return to work . . . the 27th, which would be 11:40 [p.m.]").

On September 27, Van Ever-Ford saw Dr. Elibol to follow up on her emergency

room visit.  Defendants' Exhibit 7 at 83; Docket Item 147 at 92.  Dr. Elibol told her that

the headache she had experienced was the result of high blood pressure, and he

prescribed medication.  Docket Item 147 at 92-93.  Van Ever-Ford had not experienced

high blood pressure previously.  *Id.* at 92.  Dr. Elibol told Van Ever-Ford that she could

return to work on September 30.  Docket Item 147 at 54.

Van-Ever Ford called into work on September 27 after her visit with Dr. Elibol and

spoke to another Nurse Administrator, Laura Murphy.  *Id.* at 53-54.  Van Ever-Ford "was

trying to explain to [Murphy] that [she] had spoken with [Hoak] . . . and [she] was not

comfortable with the date that he told [her] top come back to work."  Joint Exhibit 20 at

35.  Van Ever-Ford told Murphy that the September 28 shift "wasn't two days after [her]

doctor's note."  *Id.*  According to Van Ever-Ford, Murphy gave the phone to Hoak, who

reiterated that he expected her to return for her September 28 shift starting that

evening.  Docket Item 147 at 53, 97-98.  When Van Ever-Ford "hung up the phone with

[Hoak], [she] knew that he was expecting [her] to be there the night of the 27th and work

a shift the 28th."  *Id.* at 97.[4]  There is no evidence that Van Ever-Ford told Murphy or

---

[4]  Hoak does not recall speaking with Van Ever-Ford on September 27, and there
is no note documenting the conversation in the BPC's call-in roster.  Joint Exhibit 13 at
8; Docket Item 149 89-90.  This Court need not resolve this factual discrepancy: even
assuming that Van Ever-Ford's version of the events is correct, she still would not
prevail on her claim.

14

Hoak about Dr. Elibol's instruction that she should not return to work until September 30.

Van Ever-Ford did not come to work for her September 28 shift, and the BPC considered her absence a "no-call/no-show." Joint Exhibit 7 at 3. The next two days—September 29 and 30—were pass days for her. *Id.*

On September 30, Van Ever-Ford faxed three doctor's notes to Janice George, a secretary in the BPC Human Resources Department. Joint Exhibit 15; Docket Item 147 at 98. The first document was a copy of the note from the Sisters Hospital Emergency Department saying that she could return to work two days from September 26. Joint Exhibit 15 at 2. The second note was from Dr. Elibol on September 27, instructing her to stay off work until September 30. *Id.* at 3. The third note was from Dr. Elibol on September 30, stating that she could return to work without restrictions on October 2. *Id.*

On October 2, 2010, Van Ever-Ford returned to work. Joint Exhibit 7 at 3; Docket Item 147 at 55.

## III.   VAN EVER-FORD'S TERMINATION

Prior to Van Ever-Ford's "no-call/no-show" on September 28, 2010, the BPC already was discussing the possibility of terminating her due to time-and-attendance problems. *See* Defendants' Exhibits 2 and 3; Docket Item 149 at 249. But they instead decided "to document it one more time, give her that feedback one more time, [and] give her another chance to improve." Docket Item 149 at 249; *see also id.* at 265. That plan changed, however, after the "no-call/no-show," which the BPC considered a "game changer" and a "serious incidence of misconduct." *Id.* at 249, 266.

15

On October 1, 2010, Sharon Ivey, a representative from Van Ever-Ford's union, contacted Fallis, the Director of Nursing, complaining that a Nurse Administrator had called Van Ever-Ford's doctor to verify a medical note.  Joint Exhibit 17.  Ivey said that she "want[ed] to be clear . . . that if there [were] any questions about the authenticity of the note, it should have been addressed by Human Resources."  *Id.*  Ivey added that Van Ever-Ford had "expressed other concerns as well regarding her work environment and supervisor" and that Ivey and Van Ever-Ford wanted to meet with Fallis "to go over these concerns as soon as possible."  *Id.*  Fallis responded that "[t]he medical documentation did not come to nursing services" and that Fallis had "received an e-mail from HR regarding [Van Ever-Ford's] recent absence."  *Id.*  Fallis also said that she could meet with Ivey "early next week, whenever [she was] available, to discuss [Van Ever-Ford's] probationary employment."  *Id.*

Later that day, Rachel Caplan-Combs, the BPC Director of Human Resources, emailed Fallis stating that Van Ever-Ford had submitted medical documentation indicating that she could return to work on October 2, but "this does not negate her responsibility to call in."  Joint Exhibit 16.  Caplan-Combs continued:

> If she was no call, no show on 9/28, that should be documented along with her excessive unscheduled absences on the special probation report we discussed yesterday. Because she has provided medical documentation for many of her unscheduled absences, but we don't have a diagnosis since she is not obligated to provide one, I would feel most comfortable if we documented the no call, no show using the probation report.  Once I have this report, I will prepare the termination letter.  I would not recommend that you meet with [Van Ever-Ford] and Sharon [Ivey] to discuss this.  We will let Sharon know of the prob[able] term[ination] when we advise [Van Ever-Ford] of it, in accordance with the [union] contract. But probationary employees are not entitled to union representation in such matters.

*Id.*

Before deciding to terminate Van Ever-Ford's employment, Caplan-Combs considered whether Van Ever-Ford might have a disability.  Docket Item 149 at 269. She concluded, however, that there was no indication that Van Ever-Ford had a disability because "there were different reasons for each of the absences."  *Id.* at 270-71.

The BPC prepared two documents prior to terminating Van Ever-Ford's employment: a special probation report, dated October 5, 2010, and a termination letter from Thomas Dodson, the BPC Executive Director, dated October 8, 2010.  Joint Exhibits 18 and 19.  The special probation report documented Van Ever-Ford's unsatisfactory time and attendance, including the verbal and written counseling and the "no-call/no-show" on September 28, and noted that Van-Ever Ford was being terminated from employment.  Joint Exhibit 18 at 2.  More specifically, Wrobel wrote, "[y]ou were counseled, both verbally and by the written word, by me, during August and September of this year.  Since the written counseling [on] 9/21/10, you have accrued nearly 3 additional days of [u]nscheduled [a]bsence."  *Id.*  Similarly, the termination letter advised Van-Ever Ford that she was being terminated because she "failed to meet the expectations necessary during [her] probationary period to continue employment."  Joint Exhibit 19.  The letter also informed Van Ever-Ford that under Civil Service rules and regulations, she was entitled to an interview with Pamela Esposito, the BPC Director of Facility Administrative Services ("DFSA").  *Id.*; Docket Item 149 at 164-65.

The BPC informed Van Ever-Ford about her termination at a meeting held on October 8, 2010.  Joint Exhibit 20 at 269-70.  Wrobel, Long, and Fallis were all present

17

at the meeting.  *Id.* at 269.  They gave Van Ever-Ford the special probation report and

advised her that she was being terminated because of unsatisfactory time and

attendance.  *Id.* at 270.  Van Ever-Ford signed the report but did not write anything in

the "Employee's Comments" section.  Joint Exhibit 18 at 2.  Although given an

opportunity to speak, she did not say anything about her time-and-attendance issues

being due to a disability.  Docket Item 147 at 101, 134-35; Docket Item 149 at 165.  Her

only comment was that "she didn't need this job."  Docket Item 149 at 165; *see also*

Docket Item 147 at 135.  Van Ever-Ford did not avail herself of the opportunity for a

post-termination interview with DFSA Esposito.  Docket Item 147 at 102-03.

## IV.   VAN EVER-FORD'S TESTIMONY ABOUT REINSTATEMENT AND REASONABLE ACCOMMODATIONS

Van Ever-Ford testified that she had no reason to believe that if she prevailed at

trial, the BPC would not reinstate her.  Docket Item 147 at 107.  She asserted, however,

that if the Court ordered reinstatement, she would return to the BPC only if she could

work a different shift.  *Id.* at 106 ("Q.  And I think you told me before that if the Court

granted you that relief, you would take it?  A. Yes.  Q. What if it was reinstated to your

job on the night shift?  A. I can't do nights.").  She said that while working at the BPC,

her body never adjusted to working the night shift.  *Id.* at 106.  She believed that

working the night shift had caused her to become run down, resulting in the flare-ups of

her various health issues.  *Id.* at 105-06.

Van Ever-Ford claims that being able to work a shift other than the night shift is a

reasonable accommodation for her disability.  *Id.* at 104-05.  She further claims that she

should be able to come in late or take off work—including unscheduled absences—

whenever one of her health issues arises.  *Id.* ("Q. . . . And the other thing you wanted

was to be able to arrive late if your disability flared up, right?  A. Yes.  Q.  And then the

third thing you wanted was to be permitted to take time off for your disability?  A. Yes.

Q. And when you say 'disability,' you mean any one of the episodic illnesses that you

suffer and which we've discussed here, correct?  A. Yes.  Q. And any new one that

might arise also?  A. Yes.  Q. And permitted to take time off, that means even if it was

an unscheduled absence?  A. Yes.").

## CONCLUSIONS OF LAW

### I.  LEGAL STANDARD

"Claims alleging disability discrimination in violation of the ADA are subject to the

burden-shifting analysis originally established by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *McBride*

*v. Bic Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009).  Under the

*McDonnell Douglas* framework, "[a] plaintiff must establish a prima facie case; the

employer must offer through the introduction of admissible evidence a legitimate non-

discriminatory reason for the discharge; and the plaintiff must then produce evidence

and carry the burden of persuasion that the proffered reason is a pretext."  *Id.* (quoting

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

To establish a prima facie case, the plaintiff must demonstrate:

> (a) that [her] employer is subject to the ADA; (b) that [she] is
> disabled within the meaning of the ADA or perceived to be so
> by [her] employer; (c) that [she] was otherwise qualified to
> perform the essential functions of the job with or without
> reasonable accommodation; and (d) that [she] suffered an
> adverse employment action because of [her] disability.

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (citing *Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004)).  A plaintiff "may satisfy the ultimate burden of proving pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 661 (2d Cir. 2009) (quoting *Dister v. Cont . Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988)).  The pretext inquiry "normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination."  *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (citations omitted).

For the reasons explained below, the Court finds that Van Ever-Ford has failed to establish a prima facie case.  Moreover, even if she had done so, she still has not established that the BPC's proffered non-discriminatory reason for her firing—her excessive absences—was a pretext.

## II.  VAN EVER-FORD HAS NOT ESTABLISHED A PRIMA FACIE CASE.

### A.  Van Ever-Ford Has Not Established that She Has a Disability.

The ADA defines "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities of [an] individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The statute provides the following non-exhaustive list of major life activities: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Id.* § 12102(4)(C). "A 'temporary impairment' lasting only a few months," however, "is, 'by itself, too short in duration . . . to be substantially limiting.'" *De La Rosa v. Potter*, 427 F. App'x 28, 29 (2d Cir. 2011) (summary order) (quoting *Adams v. Citizens Advice Bureau,* 187 F.3d 315, 316-17 (2d Cir. 1999)).

The nature of Van Ever-Ford's alleged disability has been somewhat of a moving target. Her second amended complaint alleged that she "suffers from hypertension, heart palpitations, fatigue, kidney stones, migraine headaches, sinusitis[,] and hernia." Docket Item 102 ¶ 12. At trial, she testified that by "disability," she meant "any one of the episodic illnesses that [she] suffer[ed] and which [were] discussed here." Docket Item 147 at 105. Her trial briefs, however, mention only migraine headaches and sinusitis as the bases for her disability. *See* Docket Item 130 at 6; Docket Item 150 at 15-17; Docket Item 157 at 13-16.

Regardless, Van Ever-Ford has not established that any of her various ailments constitute a disability under the ADA. As the defendants observe, "[t]he evidence at trial showed that, at best, [Van Ever-Ford] suffered from various short-term impairments while she worked at [the] BPC, none of which permanently impaired a major life activity." Docket Item 156 at 20.

Van Ever-Ford missed eighteen days of work over a period of less than seven months—and sixteen of those absences were over a period of approximately three months. Joint Exhibit 7. She produced evidence that she had two instances of sinus

issues resulting in four absences (May 11 and August 6-8), one instance of kidney stones resulting in four absences (July 2-4 and 6), and one instance of high blood pressure resulting in four absences (September 26-28 and October 1).  *See* Docket Item 147 at 75-95.[5]  She does not explain—nor does this Court see—how any of those isolated incidents demonstrate that any of those health issues constitute a permanent disability.  *See Williams v. New York City Dep't of Educ.*, No. 18-CV-11621 (RA), 2020 WL 906386, at *5 (S.D.N.Y. Feb. 25, 2020) (finding no disability where the plaintiff did "not allege a leave of absence lasting more than several days").

What is more, Van Ever-Ford did not produce evidence demonstrating that any of her absences were due to migraine headaches—the main basis for her disability, at least according to her trial submissions.  *See Reddick v. Niagara Mohawk Power Co.*, No. 5:08-CV-0995 NPM ATB, 2010 WL 5185098, at *5 (N.D.N.Y. Dec. 16, 2010) (explaining that "[s]ince none of [the plaintiff's] absences were related to her uterine fibroids, this physical impairment does not constitute a disability within the meaning of the ADA").  Indeed, there is no evidence that Van Ever-Ford had any migraines after May 2009.  *See* Joint Exhibit 4.

Van Ever-Ford claims, however, that the defendants regarded her September 26 through October 1 absences as being due to a migraine headache.  *See* Docket Item 157 at 15 ("[E]ven if the headache episode [she] suffered during her shift on September 26, 2010[,] was not ultimately determined to be the result of her migraine or sinus disabilities, the evidence establishes [that the d]efendants still regarded the episode as

---

[5]  Van Ever-Ford also was absent one day because her son swallowed a penny. Docket Item 147 at 86.  She produced no evidence giving a reason for any of her other five absences.

having to do with her migraines."). This Court disagrees. Although Van Ever-Ford initially reported having a headache, there was no evidence that she said anything about having a "migraine" or that the defendants regarded the episode as such. Moreover, the documentation that Van Ever-Ford sent to the defendants *before* they made the final decision to terminate her employment demonstrated that her symptoms were due to high blood pressure. And finally, even if Van Ever-Ford could show that her absences from September 26 through October 1 were due to a migraine headache, as explained above, an absence of several days is not sufficient to demonstrate a permanent disability.

Thus, this Court finds that Van Ever-Ford has failed to establish that she is disabled under the ADA.

### B. Van Ever-Ford Has Not Established that She Was Otherwise Qualified to Perform the Essential Functions of Her Job with or without Reasonable Accommodation.

Even assuming that Van Ever-Ford had established that she has a disability, she has not met the second prong of the prima facie analysis—that she was otherwise qualified to perform the essential functions of her job with or without reasonable accommodations.

Van Ever-Ford argues that because her "actual job performance was never criticized," her "performance was clearly acceptable, and she was well-qualified [sic] for her position as a MHTA." Docket Item 150 at 17-18. But, as the defendants observe, Van Ever-Ford's "inability to consistently report to work when she was scheduled to disqualified her from performing one of the job's essential functions—being there." Docket Item 156 at 22. Based on her attendance record, Van Ever-Ford has not shown

that she could perform the essential functions of her job with or without reasonable accommodations. *See Reddick*, 2010 WL 5185098, at *6 ("Regular attendance 'is an essential function of virtually every job.'" (quoting *Vandenbroek v. PSEG Power Conn. LLC,* 356 F. App'x 457, 460 (2d Cir. 2009) (summary order))).

Perhaps most significantly, Van Ever-Ford herself testified at trial that she would be unable to perform her prior job on the night shift. *See* Docket Item 147 at 106 ("I can't do nights."). That was the shift to which she was assigned and on which she was expected to work. So when she admitted that she could not "do nights," Van Ever-Ford conceded that she was unable to perform an essential function of her job.

Van Ever-Ford argues that the inquiry does not end there, however. As explained above, she claims that she should have been—and now should be—provided with several accommodations: (1) being able to work a shift other than the night shift, and (2) being able to come in late or take days off—including unscheduled absences—whenever one of her health issues arises. *See* Docket Item 147 at 104-05. For the following reasons, this Court rejects the claim that these are reasonable accommodations that the BPC was obligated to provide.

### 1.    Van Ever-Ford Never Requested Either of These Accommodations.

"An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Medlin v. Rome Strip Steel Co., Inc.*, 294 F.Supp.2d 279, 292 (N.D.N.Y. 2003) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)); *see also Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185 (2d Cir. 2006)

(explaining that "an employee's request for an accommodation triggers a duty on the part of the employer 'to investigate that request and determine its feasibility'" (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000))).  Moreover, "the request must be 'sufficiently direct and specific' to give the employer notice of the needed accommodation."  *Amerose v. Monroe Cty. Water Auth.*, No. 10-CV-6383-CJS-MWP, 2012 WL 5398660, at *10 (W.D.N.Y. Nov. 2, 2012) (quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009)).  Here, Van Ever-Ford offered no evidence that she ever asked the BPC to provide either of her proffered accommodations.

Van Ever-Ford argues that by "bidding on an afternoon shift," she requested the night shift as a reasonable accommodation.  Docket Item 157 at 22; *see also* Docket Item 147 at 115 ("I bidded on a shift for [the] afternoon shift, and that was rejected.").  In her view, this "was sufficient to trigger [the d]efendants' duty to engage in an interactive process with [her] to determine whether any such vacancy existed or whether an alternative accommodation could have been offered."  Docket Item 157 at 22.  This Court disagrees.  Taking Van Ever-Ford's argument to its logical conclusion, any time an employee attempted to change shifts, the employer would be responsible for investigating whether that person might have some sort of disability and whether she was in fact requesting an accommodation for a disability that she had not explicitly disclosed.  That is unworkable and beyond what the ADA requires.  *See Schneider v. Wal-Mart Stores, Inc.*, No. 16-CV-2010 (NSR), 2019 WL 294309, at *7 n.7 (S.D.N.Y. Jan. 23, 2019) ("The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at

the workplace." (quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001))).

Moreover, Van Ever-Ford admits that she never asked to take unlimited days off. *See* Docket Item 157 at 23 ("Plaintiff did not, despite Defendants' assertions, testify she requested to take off 'whenever' her disability rendered her unable to work.  Rather, Plaintiff's only request related to leave was for a few days off between September 26 and October 2, 2010[,] until her doctors cleared her to return to work.").[6]  And for that reason, the BPC had no obligation to provide such an accommodation.

In sum, Van Ever-Ford did not make a request that was "'sufficiently direct and specific' to give the [BPC] notice of [either of these] accommodation[s]."  *See Amerose*, 2012 WL 5398660, at *10.  And even if she had, the BPC still would not have been required to provide those accommodations for the reasons explained below.

### 2.    Working a Different Shift Is Not a Reasonable Accommodation.

A change in shift can be a reasonable accommodation.  *See* 42 U.S.C. § 12111(9) (defining "reasonable accommodation" to include, among other things, "job restructuring, part-time or modified work schedules[,] . . . and other similar accommodations for individuals with disabilities"); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004) ("A modified work schedule may

---

[6]  Even assuming, for the sake of argument, that Van Ever-Ford's request to take the time off from September 26 through October 1 was in fact a request for a reasonable accommodation, she has not shown that she would have been able to perform her job with that accommodation.  As explained in more detail below, the evidence shows that she was fired due to her *pattern* of absences—not the September 26 through October 1 absences alone.  And when counseled on her absences, she admitted that she could not "promise [the] BPC that there [would] not be more unschedule[d] absences."  Joint Exhibit 12.

constitute a reasonable accommodation in certain circumstances.").  Here, however, the defendants argue that Van Ever-Ford's request to work a different shift was not reasonable because the BPC has "a seniority system that determines what shifts MHTAs work and that transferring [Van Ever-Ford] to a different shift would violate the rules of the seniority system."  Docket Item 162 at 7.  This Court agrees.

An "employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient" to demonstrate that a requested accommodation is not reasonable. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002).  After all, "to require the typical employer to show more than the existence of a seniority system might well undermine the employees' expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend."  *Id.* at 404.  Nevertheless, a plaintiff "remains free to show that special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts."  *Id.* at 405.

Here, Van Ever-Ford does not dispute that a seniority system governed how shifts are assigned.  Indeed, she acknowledged that when she bid on a different shift, she was unable to get it because she "didn't have the seniority."  Docket Item 147 at 117.  Nor has she identified any reasons why the BPC's "mak[ing] an exception from the seniority system [would be] reasonable in [her] particular case."  *See U.S. Airways*, 535 U.S. at 406.  She has not, for example, "show[n] that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter." *Id.* at 405.

Furthermore, Van Ever-Ford has not produced any evidence—other than her own testimony—that being able to work a different shift would actually accommodate her alleged disability.  Although she claims that "working the night shift caused [her] to become rundown," which in turn "cause[d] . . . some of the illnesses that [she] suffers," Docket Item 147 at 105-106, she offered no medical evidence toward that end.  *See Weiss v. Cty. of Suffolk*, 416 F. Supp. 3d 208, 214 (E.D.N.Y. 2018) ("Absent from the record, however, is any admissible medical evidence that might serve to substantiate Plaintiff's claimed limitations.").

For all those reasons, this Court finds that being able to work a different shift was not a reasonable accommodation that the BPC was required to provide.

### 3.      Unlimited Absences Are Not a Reasonable Accommodation.

As explained above, Van Ever-Ford also testified that the BPC should allow her to "arrive late" and "take time off" whenever her "disability flared up, . . . even if it was an unscheduled absence."  Docket Item 147 at 104-05.  But that is far from a "reasonable" accommodation—particularly given the nature of her work.

"[T]here is a plethora of cases supporting the contention that excessive absenteeism eliminates an essential function of employment—attendance—and therefore such absenteeism does not constitute a reasonable accommodation as a matter of law."  *Reddick*, 2010 WL 5185098, at *6 (collecting cases); *see also Aquinas v. Fed. Exp. Corp.*, 940 F. Supp. 73, 79 (S.D.N.Y. 1996) ("[A] disabled employee who cannot get to work as often as her employer requires is not 'otherwise qualified' for her job under the ADA, and her employer is not required to make allowances for her absenteeism." (citations omitted)).  Moreover,  "[w]hile a leave of absence may

28

constitute a reasonable accommodation, a request for leave may be unreasonable as a matter of law . . . 'where the absences are so sporadic that the employer has no way of knowing, from one day to the next, if their employee will even be reporting to work.'" *Reddick*, 2010 WL 5185098, at *6 (quoting *Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 201 (S.D.N.Y. 1999)).  So an employer is not required to permit an employee to come to work only when she can and to scramble to get a replacement when she cannot.

Here, Van Ever-Ford was absent eighteen times in a period of less than seven months.  Joint Exhibit 7.  Sixteen of those absences were over a period of approximately three months.  *Id.*  And several of those absences were unscheduled, *see id.*, forcing the BPC to find someone to replace her at the last minute or to force someone to work a double shift, *see* Docket Item 149 at 256-57.  Being able to continue that pattern of absences was not a reasonable accommodation.  *See Bobrowsky v. N.Y.C. Bd. of Educ.*, No. 97CV874(FB), 1999 WL 737919, at *4 (E.D.N.Y. Sept. 16, 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000) (finding that "[t]here could be no reasonable accommodation" for a teacher who had been absent seventeen times over the course of a school year "because attendance is an essential function of her employment").

And that is especially so in light of the evidence at trial establishing that unscheduled absences are particularly disruptive in Van Ever-Ford's line of work. Because MHTAs provide direct patient care, when an MHTA does not report to work as scheduled, another employee must cover that shift.  *See, e.g.*, Docket Item 149 at 256-57, 261-62.  That often results in forced overtime, which takes a significant "toll on employee morale, and also can have an impact on patient care."  *Id.* at 262.  Thus, Van

Ever-Ford's contention that she should have been permitted unlimited unscheduled absences is not reasonable.

   **C.   Van Ever-Ford Has Not Established that She Was Terminated Because of Her Alleged Disability.**

Van Ever-Ford claims that the defendants' "only reason for terminating [her] was the so-called 'no-call/no-show' for her September 28, 2010 shift."  Docket Item 150 at 20.  She disputes that the September 28 absence was in fact a "no-call/no-show" under the policy and further claims that she should have been allowed to miss that day due to her alleged disability.  *See id.* at 18-20.  Thus, she reasons, "[t]he evidence establishes [that] the only reason for [her] termination was her disability."  *Id.* at 18.  This Court disagrees.

Without a doubt, the evidence at trial showed that Van Ever-Ford's attendance in the third quarter of her probationary year was unsatisfactory and that she was terminated as a result of her overall attendance record.  The BPC management began to express concern about Van Ever-Ford's absences in early August 2010.  *See* Defendants' Exhibit 2 at 4 (August 6 email from Shea to Wrobel stating that Shea had noticed that Van Ever-Ford "started in Jan and has 10 call ins all with pass days" and asking whether "these [were] reflected on her eval[uation]s and [whether they had done] anything corrective"); *id.* at 3 (August 18 email from Shea to Wrobel instructing that Wrobel should "give her written counseling now" and "point out any further [sick absences] will result in recommending termination").  Her immediate supervisor then informally "coach[ed]" Van Ever-Ford and warned her that her employment might be in jeopardy.  Joint Exhibit 21 at 255, 263.  Then, on September 21, Supervisor Wrobel issued Van Ever-Ford a strongly-worded written counseling memorandum, stating,

among other things: "I cannot stress enough to you, the need to come to work without having any [u]nscheduled [a]bsences.  Your employment may be terminated as a result of the [u]nscheduled [a]bsences you have accrued."  Joint Exhibit 12.

Thus, before Van Ever-Ford's "no-call/no-show" on September 28, 2010, the BPC management team already was discussing the possibility of terminating her employment due to attendance problems and notified Van Ever-Ford of their concerns. *See* Defendants' Exhibits 2 and 3; Docket Item 149 at 249.  And when the BPC terminated Van Ever-Ford, its management team explained to her that it was because of her excessive unscheduled absences.  *See* Joint Exhibit 18 at 2 (Wrobel's explaining to Van Ever-Ford: "You were counseled, both verbally and by the written word, by me, during August and September of this year.  Since the written counseling [on] 9/21/10, you have accrued nearly 3 additional days of [u]nscheduled [a]bsence.").  The September 28 incident was thus nothing more than the straw that broke the camel's back.  And at her termination meeting, Van Ever-Ford never said anything about her absences being due to a disability; on the contrary, she remarked only that "she didn't need this job."  Docket Item 149 at 165.

Van Ever-Ford argues that "but for what [the d]efendants labeled a 'no-call/no-show' for [her] September 28, 2010 shift, [they] would not have terminated [her] *when they did*."  Docket Item 150 at 20 (emphasis added).  That may well be true.  *See* Defendants' Exhibits 2 and 3; Docket Item 149 at 249, 266 (Caplan-Combs's testifying that the BPC management was planning to "give [Van Ever-Ford] another chance to improve" but that the "no-call/no-show" was a "game changer").  But contrary to Van Ever-Ford's suggestion, that does not mean that the defendants' "*only reason* for

terminating [her] was the so-called 'no-call/no-show.'"  *See* Docket Item 150 at 20

(emphasis added).  The reason for terminating her was her overall pattern of

absences—even if the "no-call/no show" was the "catalyst."  *See* Docket Item 149 at

143.

What is more, even assuming that Van Ever-Ford is correct that her September

28 absence should not have been classified as a "no-call/no-show" and that it was the

but-for cause of her firing, she still has not demonstrated that her firing resulted from her

alleged disability.  Put another way, even if she can demonstrate that she was wrongly

fired because her September 28 absence was misclassified, that would not state a

claim under the ADA; she still must connect the firing to her alleged disability, and she

has not done so.

As explained above, the reason for her late September absences was an

incidence of high blood pressure, causing a headache.  *See* Joint Exhibit 14 at 7 (noting

that Van Ever-Ford presented at Sisters Hospital "with complaints of [h]eadache" and

"[h]igh [b]lood [p]ressure"); Docket Item 147 at 121 (Van Ever-Ford's testifying that the

diagnosis from this visit was "[a]cute headache as the result of the onset of high blood

pressure" and she was "never diagnosed as having a migraine headache . . .. during

this incident"); Docket Item 147 at 92 (Van Ever-Ford's testifying that Dr. Elibol told her

that the headache she had experienced was the result of high blood pressure").  But

there is no evidence in the record that high blood pressure was a condition that

"substantially limits one or more [of her] major life activities."  *See* 42 U.S.C.

§ 12102(1)(A).  Indeed, she testified that this was the first time she had high blood

pressure.  Docket Item 147 at 92.

So Van Ever-Ford's circuitous attempt to link migraines to an alleged disability and then to her firing fails.  There is no evidence that she suffered from migraines on any regular basis.  Even if there was, there is no evidence that any of her absences from work—the reason her employment was terminated—were linked to migraines.  And the straw that broke the camel's back—the "no-call/no show"—had nothing to do with migraines, or any other disability for that matter.

### III.   THE DEFENDANTS' NON-DISCRIMINATORY REASON FOR FIRING VAN EVER-FORD WAS NOT A PRETEXT

Even if the Court assumes, for the sake of argument, that Van Ever-Ford had made out a prima facie case of discrimination, the defendants have proffered a valid non-discriminatory reason for her termination.  As explained above, the evidence shows that she was a probationary employee who had excessive absences, including numerous unscheduled absences.  Van Ever-Ford has not produced evidence demonstrating that the proffered reason is a pretext.

Van Ever-Ford asserts that she "complied with [the d]efendants' [time-and-attendance] policy completely."  Docket Item 150 at 18.  More specifically, she states that the "policy did not require employees to provide specific medical reasons for taking sick leave, even when that sick leave was unscheduled."  *Id.*  And "[a]s long as a[n] MHTA notified [the d]efendants she would be absent from her shift at least one hour prior to the start of that shift, that absence is not considered a no-call/no-show."  *Id.*  According to Van Ever-Ford, she informed Murphy and Hoak that she would not coming to work for her September 28 shift, so that should not have been deemed a "no call/no show."  *Id.* at 18-19.

33

But Van Ever-Ford admits that she understood that Hoak expected her to report for her September 28 shift.  *See* Docket Item 147 at 98 (Van Ever-Ford's testifying that when she "hung up the phone with [Hoak] that day, [she] knew that it was his expectation that [she would] be there" that evening").  Thus, she knew that by not reporting for work, there would be an unanticipated absence that would need coverage.

Van Ever-Ford also overlooks the provision of the time-and-attendance policy covering probationary employees.  As explained above, that provision states that "[a]n employee's attendance should be an important factor in every probationary report and performance evaluation" and that "[e]mployees should be terminated from probation if their attendance record is unsatisfactory."  Joint Exhibit 2 at 4.  Van Ever-Ford does not explain why her eighteen absences in under seven months during a probationary period was not a legitimate reason to terminate her employment.

Van Ever-Ford further claims that she was treated differently than another MHTA—Shannon Cline—who had similar time-and-attendance issues but was not terminated.  *See* Docket Item 149 at 143-44; Docket Item 150 at 20-21.  According to Van Ever-Ford, the only difference between her and Cline was that the defendants "were clearly aware of [Van Ever-Ford's] disability throughout her employment and at the time of her termination."  Docket Item 150 at 20-21.

But that is not so.  Although Cline had "unsatisfactory" time and attendance on her first probationary report and "needs improvement" on her second probationary report, she had "satisfactory" time and attendance on her third probationary report.  Plaintiff's Exhibits 6 and 7; Docket Item 149 at 146-53.  Thus, unlike Van Ever-Ford, Cline improved her time and attendance after she was counseled about it.  *See* Docket

34

Item 149 at 148.[7]  Van Ever-Ford's time and attendance went in precisely the opposite direction.  It therefore is not true that Van Ever-Ford was similarly situated to Cline but treated differently.

## CONCLUSION

For all the reasons stated above, the Court finds that Van Ever-Ford has not carried her burden of proof to establish, by a preponderance of the evidence, that the defendants violated the ADA.  The Clerk of Court shall enter judgment for the defendants and close this case.

SO ORDERED.

Dated:      October 8, 2020
            Buffalo, New York

_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[7]  Van Ever-Ford also previously suggested that she was treated differently than another employee named "Mr. MacVittie," *see* Docket Item 149 at 143-44, but her post-trial brief mentions only Cline, *see* Docket Item 150 at 20-21.  In any event, MacVittie was not terminated by the BPC; he resigned in lieu of termination due to other serious misconduct.  Docket Item 149 at 148.  And the evidence suggests that he would have been terminated had he not resigned.  *Id.*